This matter is in the Asbestos Products, Mr. Frankenberger, the actual plaintiff has restated. For what you sent out. Ah, okay, all right, all right, I found it. Great. Morning, Your Honors. Morning. My name is Bob McCoy, Robert McCoy, I'm here for the appellant, and I would like to reserve five minutes for rebuttal time. Okay. I think we should start with a conflict of law issue, which law really applies? There's no question here that Illinois law is the applicable law. Illinois? Illinois. Right. Well, for the purposes of when you do make the choice, for the purposes of how the choice is made, Indiana law applies. Okay, so Indiana's law governs, but Indiana law says under these circumstances, we, Indiana, apply Illinois law. Right. Okay. Exactly. Because? And the reasons are, number one, Judge Rubino pointed out that the exposures primarily were in Illinois. CBS Westinghouse did not develop a record of exposures. Of the three plants that he was in, two were in Illinois and one was Indiana, and this person worked many years in these three plants. How many years did he work at the Indiana plant? As I recall, the testimony was the outages were about four to six weeks each for all the different powerhouses. So he would go back and forth? How many years did he work at this? How long did he work over all these many years at the state line power plant, which is in Indiana? The only job we have in the record is the outage, which was about four to six weeks. That was the testimony of the coworkers for each of the outages, whichever plant it was, was four to six weeks. But state line, we have to remember, the guardhouse is in Illinois. What is in Illinois? The guardhouse, the place where the deliveries are made. Under that Indiana products liability law, statute of repose, that's based on the site of the delivery. So if you're looking at that statute, the delivery is in Illinois. What is the last event necessary to make someone liable? Didn't that occur in Indiana? Right. In this case, the deference should be given to Judge Rubino's expertise in asbestos issues. Why doesn't this appear? I'm sorry. I'm sorry. Go ahead. Go ahead. And the last event in asbestos cases is the injury producing event, which is the exposure. And there's a few reasons why that's significant. But is there any Indiana case that says that? There's no Indiana law that says where the last event occurs in an asbestos case, no. There's no decision. But the important thing here is that when you talk about an asbestos case, the disease has a long latency process where you've got your exposure and the injury is progressive, and that's occurring over time. So when you get down to the question of the Indiana statute, which focuses on when the disease manifests or is diagnosed, basically, it's a question then becomes if you worked all your life in the state of Illinois and you retired in Florida, then just by the luck of the draw, you would end up having Florida be the place. But this isn't necessarily luck of the draw. This is a person who lived in Indiana, was diagnosed with mesothelioma in Indiana. One of the plants he worked in, the state line plant, was in Indiana. And so it would seem he chose to follow the action, and his wife chose to follow the action in 1996 in Indiana. Why does this not be Indiana law that applies? Because the injury, the last event, the injury-producing event is there's exposures at which were primarily the Illinois sites. And I say this again because... But we don't know how much he worked. Of the many years he worked, yes, he worked at two out of three plants in Illinois, but how long was he exposed in Illinois possibly to asbestos versus how long was he exposed in Indiana possibly to asbestos? Well, he was primarily exposed to asbestos in Illinois much longer than, because most of his work sites were Illinois. But the sites, I'm asking about length of time of service. Okay. Well, for the exposures in the record here that we've developed, that are developed, you have two outages of four to six weeks at sites in Illinois, and you have the outage of four to six weeks at the place where the guardhouse is Illinois and the work area is Indiana. That's the state line powerhouse. So you primarily, for the exposures that are developed in this record, are Illinois sites. I mean, that's what it is. And like I say, this delivery being to the Illinois guardhouse, that would also... So I'm going to ask another dumb question, but it goes back to what I asked. Are you saying he would switch? He would just go from one plant to another over the course of many years? Right. He wasn't confined to any particular plant. Right. He was working for a union. Like rotations. Right. And wherever the jobs were, that's where he went. These are big industrial site jobs. These pipe fitters for the unions go to these big places. And the union was out of Chicago, right? Right. The union was based out of Chicago. CBS Westinghouse did its service and work and installations out of the Chicago office for both Illinois and northern Indiana. Indiana has a statute of repose of ten years. Is that right? That's correct. Does it have the same? In Illinois, the statute of repose would not be applicable to this scenario. Because? Because under Illinois law, the claims for negligence are not barred by a statute of repose that's been established, the products liability statute of repose. That's not really disputed by the parties, but there is case law on that. I think it was the Edcock case, but I can't remember right now which one it was. But it's not disputed that if it's Illinois law, we don't have a bar. But let me add one other thing here that's important, which is a person could, under the scenario that you're not basing this on places of exposure, go forum shopping in asbestos cases and get their diagnosis in a particular state that had more favorable law. I mean, that could well be done because people start feeling the signs and symptoms, but they don't get a diagnosis from the doctor. This routinely happens with our clients. People know they got it. These guys who worked in the trade, they know what they got, and they could go to another state and get their diagnosis or go live there, and they could go to a place that's more favorable. That's what I mean about the importance of the latency period here and why Judge Rubino, in his expertise on these asbestos cases, is focusing. Let's go on to the turbines and the switchgear. Assume for the moment, even though I realize you don't agree that Indiana law applies, if Indiana law applied and there was a statute of repose, how does Mr. Frankenberger still win with regard to the turbines? How does he still win with regard to the switchgear? If the Indiana choice of law is Indiana law for the statute of repose issues, then for the claims involving the turbine outages, those are maintenance work. Those would not be barred, but not so with the switchgear. Did you get that backwards? Right. The claims involving the construction work during the outages or service work, those claims would not be barred. On turbine or switchgear? On the turbine work. I thought it was the other way around. I'm sorry to interrupt you. I thought it was the other way around. If there's a sale of a product, then the claims are barred. But on the turbine outage work, which is maintenance work, Westinghouse is only selling the services of taking apart and putting back together the turbine. So that's service-oriented work, and that's not barred under the sale of the product, nor is it barred under the other statute involving construction statute of repose because that requires an improvement. Here there's no improvement. You're just taking apart and putting back the same turbine in place, so you're just doing maintenance work on these outages. So under either of the Indiana statutes, the one that involves a sale, you don't have a sale. The one that involves the construction of an improvement, you don't have improvement work for the turbine. Do the maintenance on the turbines, when they really take them completely apart and reassemble oftentimes with new equipment? There's no evidence in the record that there's new equipment involved here. These are very sophisticated pieces, and you're not going to be changing parts on these turbines. The only evidence was that they tried to, wherever possible, use preexisting equipment. They just kind of recycled the parts when they did the repairs. Well, they had to because these parts on turbines are ground very specifically to fit very closely to each other, and it's very expensive, and these turbines cost $10s, $20s, $30s, $40s, $50 million even back in those days. And you don't have in four or six weeks shutdown time to do anything other than just get it oiled and get it greased and get it running again. So if they did work on a 1075, they had to work on a turbine that required new parts. You're saying that that new part probably would have been manufactured before 73, which was the period where they probably had asbestos in it? Am I confusing that with a switchgear? Well, I'll answer that question by saying there isn't evidence of any new parts. What might happen is the insulation materials, some of those might have to have been replaced before 73. For the most part, the record shows they just used and put back on what they took off as far as blocks and pipe covering. Now the muds they would have had to mix back up for the insulation. It's all asbestos. But there might have been a few pieces of the block that got torn apart when they were taking apart the turbine. So those would have to be replaced. And your Honor is right that before 73, according to Westinghouse's own witness, the replacement insulation material had to be asbestos. So they would have been putting back on asbestos materials. But again, they're not improving the turbine. They're just putting back on what was already there. Before you sit down, can you give us a little more detail about the switchgear? What was it designed to do and what are the parts involved? That's a good question. I was thinking about it when I came up with that question. Good job, Dan. I wish I was young enough to be a Lockhart back then. My Lockharts are pretty old. Right. Maybe not this year. Years ago when I was in that role. Don't worry, Dan. It may be the only time this year that happens. Right. Everybody turns a little older. So, yeah, that switchgear equipment is also the same type of equipment scenario where you have very specific design of the switchgear and basically you don't replace hardly any parts in it. What happens over time is there's wear and tear on switchgear, which we explained. And switchgear, the reason why you don't change it much is because, again, it's designed to absorb the impact of these incredibly huge arcs that you get when you're running at 440 or higher voltage in these settings, and so you have to stay with what was originally built. And what you've got is a setup where it's primarily a steel shell, which is inside of the cabinet that's closed to protect everybody from what goes on inside the switchgear. And what happens is these electricity is flowing through there, and as we all know, every once in a while, if you plug in something to an outlet, you see a spark. Well, that happens in the same way inside these switchgear cabinets. That then causes the deterioration of the insulation materials, which is the photos that we have in the record. In addition to that, there was also some pages I saw about the insulation specifications that weren't in the record. I believe these are in the trial court record as part of Document 196. They were Exhibits 128. Anyway, they're about 128, 129, and 130, or 129, 130, and 131. These are the specification cards that Westinghouse uses that make sure these are constructed out of asbestos. So within that structure, you have certain pieces that are asbestos-contained by design to absorb the electrical shock, and that's what the function is. That's what causes deterioration as these things get hit in the age over time. So these are all normal operations. I think that's what's critical here. These are normal operations, and there's nothing in the evidence to show that these powerhouses, these turbines, or these switchgears behaved any differently for operating purposes or for maintenance purposes. And when you add up these normal operations to the findings that Judge Rubino already provided about asbestos content and the use of these Westinghouse products, the combination of these things should have led to summary judgment being denied, and that's basically the point of this appeal is normal operating maintenance of this sophisticated equipment had to occur in the same way each time the experts testified to that. Excuse me. The conflict of law issue, is that properly before us now? Our position was that it's not before the court because no appeal was taken on that. I believe that motion was at least ruled on in a preliminary way, but our position remains the same on that, that that should have been the subject of a cross appeal because it has nothing to do with separate issues that were raised concerning exposures to asbestos. Thank you. Good morning, your honors. May it please the court, I'm Christopher Kinley here today for CBS Corporation. I'll probably refer to it by its former name, Westinghouse, if that's all right with the court. I want to start where Judge Sirica just left off, which is whether the choice of law question is properly before the court or not. It is. There was no need for a cross appeal of a summary judgment that was awarded to me. As the winner, there was nothing for me to cross appeal, and I'm not seeking any greater relief from this court than I received from the district court, a summary judgment in my favor. And under those facts, as we discussed in our response to the motion to strike, Third Circuit authority is clear that there's no cross appeal needed for me to assert the choice of law question as a right for any reason grounds for affirming. Getting to the substance of the choice of law, Indiana law is clear that the place of exposure has absolutely nothing to do with determining the lex loci. The only thing that determines the lex loci is the last event necessary for liability, and that's important because, as we cite in our brief, under both the Allied Signal v. Ott case from the Indiana Supreme Court and the Jurich v. John Crane case from the Indiana Court of Appeals, there is no actionable claim for asbestos exposure until the physical harm manifests itself and is diagnosed as a physical injury. You can have as much asbestos exposure as possible. You still have no actionable claim until the last event necessary occurs, which is the manifestation of harm. That's a presumption, keep in mind, under Indiana law, right? That's correct. So the presumption can be rebutted? It can be rebutted under the rare circumstances, to use the term of the court, that the lex loci has no significant, no connection other than that to the litigation. And that would get to the forum shopping question that Mr. McCoy brought up. If everything about this case had happened to Illinois, Mr. Frankenberger had developed some kind of symptom that he thought might make him able to file an asbestos claim, ran to Indiana and got diagnosed there because he thought the law was more favorable, that would be a different situation than the one we have here where Mr. and Mrs. Frankenberger at the time of diagnosis were Indiana residents, where they chose to file their case in the Indiana forum, where we have some amount of the exposure occurring in Indiana. What amount? What amount? Well, we don't know. I know. And that is the reason why I think... But the great majority of the exposure was in Illinois, was it not? I don't think we know that either because there's no deprecage in Indiana. So the only exposures at issue are not just the Westinghouse exposures. It would be the exposures as a case as a whole because the Indiana versus Illinois law decision would not be a Westinghouse-specific decision. And in this case, we have a three-page listing of job sites. Many are in Indiana. Many are in Illinois. The dates are wide at both. And frankly, I believe that's why the Indiana courts decided that the site of exposure would be a completely unworkable solution for fixing the lakes loci. We know where the injury manifests itself. We may not know where most or latest or bulk of exposure occurs. In these exposure cases, there could be years and years and years of latency, and the Illinois Supreme Court hasn't specifically grappled with this fact situation, has it? Relative to the lakes loci question, Your Honor, not that I'm aware of. I'm unaware of any case. The closest that I could point to that I think comes close to that would be a decision that we discuss in our brief that is not an asbestos case, but I believe that from a working standpoint, it is analogous, and it's the Shaw decision. It's 863 Northeast 2nd, and it's an Indiana Intermediate Appellate Court decision. But in Shaw, it's very interesting. Indiana teenager goes over to Illinois to a bar and is served alcohol underage. She then gets back in her car, drives back across the Indiana state line, and is in a fatal car accident in Indiana. All of the exposure, all of the contact with the defendant, all of the tortious conduct happened at the site of the illegal sale of alcohol to the minor and her consumption of it. Just like Mr. Frankenberger is alleged to have consumed asbestos particles in one state, the alcohol is consumed in one state. The young lady then crosses the state line where her injury occurs, and the Shaw court unequivocally held that the site of the wreck, the site of the death, was the Lex Loci, not the site where she had been sold the alcohol or consumed the alcohol. And this is the quote from Shaw. It's from 863 Northeast 2nd at 431. Quote, where the issue is the choice between the law of the place where an injury, where an allegedly wrongful act or omission took place, and the law of the place where physical injury was inflicted, the general rule is that the place of the tort is the place where the injury or death was inflicted and not the place where the allegedly wrongful act or omission took place. And I believe even though that's not an asbestos specific case, that exact same legal principle controls here. And as I said earlier, is that a mere presumption? Yes. But the Indiana courts have said that that presumption cannot be overridden if the Lex Loci otherwise has some significant connection to the tort. Here it does, as the residence of both the plaintiff and the decedent, as the site of at least some of the exposure, as the site where this improvement, at least one of the improvements to real property was located, as the forum of choice. There are certainly significant connections. And despite research. The Jurek versus John Crane case said that the presumption could be overcome if, quote, the place of the tort bears little connection to this legal action, close quote. And I guess what we're trying to explore is does the place of the tort bear little connection to the legal action? In other words, does Indiana, if you normally would follow Indiana law, the place of the tort would be considered the last event, Indiana. But does Indiana bear little connection? And if he spent very little time at the plant in Indiana, but 90% of his time at the plants in Illinois, and he operated out of the union in Chicago, conceivably one could overcome that presumption, could they not? I would make two points, Judge Amber. The first one is I think there's actually three steps. The first is to identify the Lex Loci. The second is to see in isolation does the Lex Loci have a significant connection to the suit? And only if the answer to that question is no do you go to the third step, which is to look to see what other state may have more or different connections. So I don't think you can get into the union hall. I agree with you. In other words, you could have more connection with Illinois, but nonetheless, if you have significant connection in Indiana, you still win. That is absolutely correct. You still win. But if you could show that there's very little connection in Indiana other than the fact that's where he was diagnosed and he happened to work a little bit of time at an Indiana plant, but much more of his time at Illinois plants and other places, then theoretically you could overcome that presumption. And that would be Mr. McCoy's hypothetical of the person who everything else happens in Illinois, but for purposes of availing themselves of Indiana law, they drive across the Indiana state line to be diagnosed. That would be that case. That is not the case, though. Indiana exposure, Indiana diagnosis, Indiana medical treatment. I researched this as thoroughly as I knew how. I could not find a single case by any Indiana appellate court that ever found the lex loci in Indiana with an Indiana resident did not have a significant connection. Let's assume you're right. We can get on to the turbines and the switchgear. Would a turbine shutdown, as opposed to the initial installation of a turbine, constitute a construction improvement, which is how you would propose to come into play? The short answer is probably not, and I want to frame my answer to that this way. I think if Indiana law applies, I believe what I heard Mr. McCoy say is in fact what the truth is, is that the switchgear claims go away under the product liability statute. You're furthering your answer because it's confusing the way you stated the answer. You're saying if Indiana law applied. The issue, from your perspective, is not whether or not Indiana applies. You're saying it clearly applies whether or not Illinois law is important in the Indiana law. Well, I'm saying whether Indiana substantive law would be the choice made under the Indiana choice-of-law test.  We have a statute to propose. Then we have the product liability statute to propose that certainly takes out the switchgear claim because there's no allegation of any post-delivery activity by Westinghouse, and it's clear that more than ten years lapsed between the delivery of the switchgear. Wait a minute. Maybe on switchgear, Mr. Sperber said that the switchgear was made by Westinghouse. Correct. And then the Westinghouse corporate designer or designee, excuse me, McMullen, didn't he give a deposition to the effect that the state line power plant, if it had Westinghouse switchgear, it would have been of the DH, i.e. asbestos-containing switchgear, as opposed to the CA, non-asbestos-containing switchgear. I had a hard time understanding that part of Mr. McMullen's testimony. What did Mr. McMullen say? Mr. McMullen says that some switchgear have asbestos-containing components and some switchgear do not. Wouldn't that be an issue for the jury to figure out? Well, it would be if there was any evidence in the record that would make it anything more than a matter of speculation or conjecture. Well, but you've got a cause of death here being asbestos exposure. He was exposed to it somewhere. And certainly he was. Certainly with the industry that he worked in, the asbestos insulation on piping, the fireproofing, I have no doubt that he was exposed to asbestos. The question would be whether he was exposed causably or in a causation relationship to Westinghouse asbestos. But wasn't it enough here to get that question to the jury, especially given the evidence about the manner of the maintenance, the blowing out? It seems to me the district court thought that there was an issue with not enough to get past the summary judgment because of the possibility of the buildup of environmental dust. But there's some evidence that the buildup of environmental dust would actually trigger the kind of deterioration that would lead to asbestos exposure. Your Honor, I would disagree with that. I want us to assume for a minute that this is an asbestos-containing switchgear. Even an asbestos-containing switchgear, the amount of asbestos involved is minuscule. You have a certain component inside of the switchgear cabinet called an arc chute. Most of the arc chute, over 90% of the arc chute, is not asbestos-containing. You have several little strips of three-eighth-inch varnish-coated asbestos rope and an asbestos end cap on each end. That becomes important because plaintiff's experts basically say you have insulation in the switchgear and you have metal. So if there's dust coming from the switchgear, it must come from the insulation. Assuming that to be true, if you look at the supplemental appendix provided by Westinghouse in relation to our brief at page 53 of 173, at page 97, at page 73, those are the three spots, there's a clear discussion of which parts of the arc chute are subject to disintegration under these normal operating procedures that plaintiff describes. The only testimony in the record of the relative effect of those impulses of electricity is that the asbestos-containing parts of the insulation are unaffected and that it's the ceramic or porcelain parts that crack, break, and disintegrate. So that even if this was an asbestos-containing switchgear, even if it had an asbestos-containing arc chute, you still would not have the evidence in the record that would make it other than conjecture or speculation for a jury to assume that the dust came from an asbestos-containing part of the arc chute. But do we resolve that here or is that something that the jury would have to hear experts on? I believe for summary judgment purposes, we had those experts testify and that record was in the court and that evidence did not raise a genuine issue of fact, so it was proper for summary judgment. But once again, Westinghouse's primary position is we never get there. But as to how much asbestos is contained in the switchgear, that's disputed, is it not? I don't believe there was any contrary evidence to the relative quantity of asbestos in the switchgear. How much asbestos is in the switchgear? I gave the exact percentage in our brief and I've never been good at math. I think it's 0.26 of 1% by weight. We're talking a minuscule amount. But a minuscule amount could be enough to raise an issue about whether or not it was sufficient for causation. If there was evidence showing that those specific components had broken down or that those specific components broke down under normal use and operation and created dust, I might agree with you, Judge McKee. That would be closer to the situation that this Court had, I think in July, in the Haas case, where there was evidence that under normal operating procedures, the asbestos-containing components in a particular jet engine broke down and created dust. That's not the circumstance we have here. I thought Sperber, in his deposition, described the switchgear as 6x16x2. It was connected to what he called big, close quote, equipment. Right. And it was marked as high voltage and it was cleaned by using compressed air. Correct. So if it was cleaned by using compressed air, even if there was not a whole lot of asbestos nonetheless, that could really get into the air pretty quickly if, in fact, it could be shown that there was a lot of, over the course of time, this particular person was involved in the cleaning of switchgear. Certainly I agree with that as well. If there was evidence that the asbestos components had broken down and the only question in this case was was there enough exposure, that starts to sound like a jury question. Here, the undisputed evidence shows that the asbestos-containing products themselves, as opposed to the porcelain or ceramic insulation, did not break down in normal operation. So we're not talking about... So if it goes to trial, you're saying you win.  But we don't get that far because there's no way around the product liability statute or proposed relative to the switchgear. There's no post-construction work as to or post-delivery work by Westinghouse to the switchgear, which brings it directly and squarely within the product liability statute or proposed. I know my time is up, but I wanted just very briefly to address one last point. It was the point Mr. McCoy made with regard to the turbines, where he said, even if the construction statute or proposed would knock out a claim arising from Westinghouse's original design or construction of the turbine, that he could still proceed on a claim arising from Westinghouse's presence during overhauls of the turbine after construction because that's not a new construction of a new improvement. Again, I think I would agree with Mr. McCoy that if there was evidence that Westinghouse came in as part of these turbine repairs and that Westinghouse did insulation work that exposed Mr. Frankenberger to as best as separate and above what had happened in the first place, there might be a problem from a client. But the undisputed evidence in this case is, again, that while Westinghouse's engineer with his hard hat was present to do the technical work, first you have to strip off the insulation. Then you crack open the turbine, and that from CBS's standpoint is when the magic begins. That's the complicated part. That's why we have to be there because that's warranty work. The question is, did Westinghouse do anything by standing there that exposed Mr. Frankenberger to asbestos? And the answer is we didn't. The undisputed evidence in the record is that Westinghouse's presence during the turbine overhaul did not extend to any contact with the activities of removing or replacing insulation. And you can find that at supplemental appendix attached to our brief, pages 85 and 96 to 97. The only testimony we have in the record with regard to that is from Mr. Ware, and Mr. Ware testifies that when we had a technical advisor present for a turbine overhaul, they were never involved in the removal or replacement of the insulation. So nothing Westinghouse did as part of the turbine overhaul was a new tort, was a new exposure. Everything would have to relate back to what we had from the original. What you're saying is your stronger argument relates to the turbines as opposed to the switchgear, and you're saying nonetheless you claim you still went on the switchgear at summary judgment. That's right.  Thank you. All right. Thank you, Your Honor. Charlie, thank you. Mr. McCoy, do you see us in time? Judge, I want to turn to the statute of repose question again, and this question of the connection. So if a connection is being asserted because of place of residence at the time of exposure, these crews are large crews. You might have 10 people from Illinois working on that turbine who reside in Illinois. You might have 10 people who reside in Indiana. The point being that you've got Indiana courts when somebody sues Indiana setting out a presumption that Indiana law is going to apply unless there is little connection of Indiana. Assuming, yes, I'm assuming now that the presumption applied. In my first-round argument, I said, and I think Judge Rubino found, it doesn't apply because of the point of exposure is where you determine the last event. That's when the injury actually begins under the case law for asbestos, science of asbestos. But let's assume the presumption applies. Then you get to the question of what's the connection. Well, if the connection is being asserted because of residence, like I say, there could be 10 members of that pipe fitter crew that come from Illinois, and there could be 10 members that come from Indiana, and there could be 10 members that are visiting from Wisconsin on that crew. That would mean you've got three different standards of care for things like warnings and safety measures and procedures in the course of a very, very sophisticated piece of work where you've got a lot of potential exposures, not just for asbestos, but people falling off ladders and all kinds of other standards. It doesn't make sense to say that a connection exists because of residence because you would have people on the same work site being subject to different standards of care based on residence, not based on the person supervising and the duties that need to be followed for that particular job. The other thing is that you might say the place of connection is based on place of diagnosis. Well, or the connection is based on place of diagnosis. Again, that doesn't make sense because you don't even know where that person's diagnosis is until it gets made due to the latency period 10, 20, 30 years later. Or more. So if the person moved to Florida or if they ended up staying in Indiana or if they moved to Illinois, again, or Arizona, a lot of people have a lot of clients in Arizona and Florida, that's for sure. And for my firms, asbestos practice. But if they move to these different states, once again, you don't even know the standard of care for these important safety issues at the time that the job is ongoing if that's the basis for the connection. You can't have it based on something that you don't even know to be the applicable law or what law will govern when you're doing this kind of sophisticated work. So once again, it doesn't make any sense to say that you've got to wait and you don't even know your standard of applicable care until you know where you end up getting your diagnosis. That's the whole point of the reasoning that I think Judge Rubino is following based on his knowledge of asbestos. The only place that makes sense here in these large types of jobs for the last event analysis or where there's substantial connection either way is the place where the job is actually ongoing. And that's what Judge Rubino found in this particular case. So under either scenario, whether you follow the place of the last event and that's where the exposure occurs or whether you follow the place of the presumption and say you need to have a connection, you don't have that connection. And in either scenario, Illinois law should consistently govern work at the job sites of a person who primarily worked in Illinois. Thank you. Thank you, Mr. McQuarrie. Could we get a transcript of this argument? And if you'll see Ms. Milato, she can explain the mechanics. Just look across. Just look across that. Thank you, Judge. Brief recess while that conversation occurs and then we'll hear the final matter.